Good afternoon. We have one appeal to hear this afternoon. Of course, we're familiar with the briefs you filed and the issues you've raised and read the authorities cited in your briefs and looked at the record. So, in the time available to you, get straight to the heart of your argument. You're not going to waive anything if there's something identified in the brief that we've not had an opportunity to discuss. Of course, we do allow for more time in these capital appeals. So, hopefully, everyone will get an opportunity to address the most important points. Please don't treat the red light as aspirational. And when it shines, if you're answering a question from the court, finish your answer. That's not going to be held against you and you'll save your time for rebuttal if you have time for rebuttal. Mr. Loveland, will you come and speak with us, please? Yes, sir. The facts are essentially undisputed in certain critical regards. Donnie Cleveland Lance is someone who has a borderline IQ and, according to the expert testimony of both the state's expert and experts called by the defense at the habeas proceeding, suffers from dementia due to multiple etiologies under the diagnosis of the DSM-IV-R. Both sides reached that conclusion. Interestingly, the Georgia Supreme Court never mentions the word dementia. It doesn't appear anywhere in the decision of the court. It doesn't appear anywhere in Judge Hunt's decision either. We submit that there were ample, and the evidence is again clear, ample red flags that should have served as a warning to any counsel to conduct an investigation into the facts and materials that were readily available as the state habeas court found. And that evidence included the fact that Mr. Lance had suffered a gunshot to his head in 1993 with a bullet still lodged in his neck, that he had other traumas to his head because of his avocation of being a dirt track racer and it had a number of accidents, and frankly, it had other head injuries as a result of altercations, one of which involved being hit in the head with a lug wrench. I think it would be helpful to talk about prejudice and particularly whether the state courts could have reasonably determined that there was not prejudice because of the failure to present this mitigation evidence. As you know, that's always a tough burden for the petitioner. As I understand it, we've got categories of mitigation here that we've seen a lot of these types before and have said and have ruled that they're the sort that can be a double-edged sword, alcohol abuse, impulsiveness, those sorts of things. So why is this case different from those in the sense that it would have been unreasonable for the state court to have concluded that your client suffered no prejudice? Your Honor, I think on the prejudice prong, and I'm assuming from your question, Your Honor, we can start from the premise that there was, in fact, nothing done at the sentencing phase by counsel for Mr. Lance. He did absolutely nothing. He did no investigation. Let's assume for the sake of the argument that there's deficient performance, okay? Thank you. Would it have been unreasonable to conclude that there was no prejudice suffered as a result? Yes, Your Honor. We submit that it is objectively unreasonable, that it is an unreasonable application of the controlling law to say there was no prejudice in this case or that it was an unreasonable determination of the facts based on the record. Either one of those two prongs takes us to the unreasonable determination on prejudice. And let me explain first by reference to the applicable authorities. We think the case – the most compelling Supreme Court authority is a case the Georgia Supreme Court did not discuss at all, which is the Rompila case. They don't have to say anything. I understand. You've mentioned already their failure to mention the word dementia. They didn't cite some case. They could have said nothing, right? Well, I would submit, Your Honor, that if we're going to evaluate whether it is a reasonable determination of the facts, there has to be some standard, some basis that we assess against it. They did nothing, and the inquiry would be the same. But they did not say nothing. They, in fact, said specific things, and what they said was an unreasonable determination of the facts. For example, not only did they not mention dementia, but they went the other way and talked about mild neurological defects. They mischaracterized the testimony and the evidence. Now, why does that lead to prejudice? Because I understand Your Honor's point. And I'd say the most compelling Supreme Court case on this is the Rompila case. The Rompila case basically looks at facts. Of course, each one of these cases has different facts, a different mix of facts, but involves a situation where counsel, although they had done investigation, although they had done certain levels of investigation and had done some consulting with mental health experts, didn't follow red flags that were readily available to them to research other things and other evidence. And that other evidence, interestingly, Your Honor, led directly to a determination of… And one of the problems with Rompila is that is a de novo review by the Supreme Court. We're here with a far more deferential standard, right? And in Rompila, Rompila had terrible upbringing that your client did not suffer. There's no question there's a difference in terms of the upbringing. There's no difference. There are different facts. Again, the standard that should be applicable here is did Mr. Lance, did he suffer prejudice because of the absence of an individualized determination at the sentencing phase? And given that there was nothing said at the sentencing phase, we believe it's clear he did suffer because of the absence of that individualized determination. Rompila does stand for the fact that once the counsel did the investigation, they learned of organic brain damage and a borderline IQ, some of the same factors we have here. This court in the Farrell v. Hall case does, in fact, do exactly what we're asking the court to do here, which is look at a certain set of facts and circumstances and determine that the Georgia Supreme Court's determination was an unreasonable application of Strickland with regard to both ineffective assistance and prejudice and overturned that decision. So that's exactly the same standard. And again, while there are different facts and there's a mix of facts that you can look at under any of these cases, that is the standard that was done. In this case, we come back to the fact that Mr. Lance effectively had nothing done at the sentencing phase at all. Now, the State says, and they make a compelling argument, that there are many aggravating circumstances here. There are many things that go on their side of the ledger, which is precisely why, for there to be any level of confidence, Mr. Lance was entitled to have the mitigating factors put on his side of the ledger as well. While we're talking about the ledger, I've read that Georgia – Justice Hunstein's opinion over and over and over again. And I don't – I can't – as we know, the Supreme Court said you've got to put all the mitigating evidence into the hopper. Did she consider the good character evidence? Did she put that in the hopper on reconsideration, or can you tell? I can't tell that she puts that in the hopper. I can tell that she evaluates, and the Court does evaluate the mental health evidence, but does so in a way which is vastly different from how the State habeas court, who heard the evidence, characterized it. The State habeas judge, who heard the evidence, said this is compelling testimony that should have been heard by a jury making a life-and-death decision. And he clearly found that based on the testimony and the symmetry, the fact that the State's own witness said that Mr. Lance suffered from dementia was something that clearly the jury needed to hear in deciding whether he would live or die. And let me explain one more reason why it's prejudicial, Your Honor, and Judge Pryor, to go back to your question. If you read the transcript of this prosecution's closing argument in the sentencing phase of this case, what he said is the following. He said Donnie Lance was a cold, calculating murderer who planned this murder for eight years and who planned it in such a way and so carefully planned it that he almost got away with it. But you didn't let him get away with it, and you caught him. The whole State's entire case is this man is a carefully calculating monster who is doing this and planned all of this. And what the testimony of the habeas case says is he's not capable of that. He has significant frontal lobe dysfunction, which prevents him from doing that sort of detailed executory planning. In this case, he would have had to have done this. So it goes directly to the fundamental theory of the prosecution at the sentencing phase, and it was not heard by the jury. So in assessing that, in assessing whether when the prosecutor says he is a cold, calculating murderer who planned this for eight years and planned each step of it. He planned to dispose of the shoes. He planned to get rid of the evidence. He planned to do all of these things. What they didn't hear was he's got dementia and had it at the time and has severe frontal lobe dysfunction that affects his executory functioning. So I believe, you know, there's substantial aggravation here. Do you agree? I agree there are substantial aggravating factors here. No question. I mean, there had been a long history of abuse of one of these victims, right? There were many instances that were brought up by the State. In this overall record, there was also allegations of abuse the other way towards Mr. Lance, which didn't come into the trial because the judge ruled that he wasn't going to try the victims in that regard. But, yes, this was a very… This was on the victim's turf. It's not like the victims were coming over to your client's place, right? Well, actually, the gunshot wound in 1993, there's reason to believe, was done… I'm talking about this crime. Oh, this was certainly at Mr. Woods' home. There's no question about that. Yeah. And Joy's face was battered until basically unrecognizable. I'm having a hard time understanding how the mental impairments that you're talking about would have necessarily led the state habeas court to weigh the aggravation differently. Not to do so would be unreasonable. Well, again, I believe that it's in large part because the state has put its information on the aggravation side, that if there's going to be an adversarial process, there needs to be the information on the other side as well. Now, it may well be that Yolen could question whether that would put these scales in equipoise. I think you could ask that question. But that's not the standard. I mean, as the Supreme Court says in Porter v. McCallum, NROP… The standard is, though, in this context, is whether the state habeas court could have reasonably determined that it wouldn't have made a difference. That is correct. And as I'm saying, I believe the standard, as this court's articulated in Farrell v. Hall and other cases, would say, no, this was an unreasonable determination. The Daniels case and other cases that we cite stand for the proposition. I mean, there is broad deference. I understand that under the ADPA, there is broad deference to the state court. But it is not unfettered. It is not a situation where the federal court then says, we don't touch this. You do have to ask the question, is it objectively unreasonable to reach this conclusion? And we submit that where the state court has mischaracterized the evidence, has simply not addressed many aspects of the mitigation evidence at all, has not ruled that the state habeas court, which made its determinations, that any of those determinations were clearly erroneous, has not, on a single one of them, ruled that the state habeas judge was clearly erroneous in his reading of the facts, and he heard all of the witnesses' testimony. It's an objectively unreasonable determination of the facts to take them and write them as the Georgia Supreme Court did. It cannot be supported by the evidence in the record. Now, that's a different issue, I believe, Your Honor, from the one that you've asked about. Well, but there's a lot of aggravating circumstances. There are aggravating circumstances. There's some mitigation here that could be aggravating. I'm sorry? And there's some mitigation here that we've said could be considered aggravating. It could be. Alcohol abuse. Alcohol abuse. It's classic, right? Alcohol abuse, there are many cases from this court and others that say that it's a double-edged sword. But look, I mean, I would submit that if I'm looking at the question of both ineffective assistance and prejudice, if I've got this stack on this side and I've got some stuff to put on this side and one of them, you know, may be a double-edged issue, I'm a lot better off putting it on the table than I am leaving the table bare. And that's what was done in this case, was the table was completely bare. But are you really necessarily a lot better off putting a double-edged sword on? I mean. Let me explain it this way. If you look at what the experts say, they say that he suffers from significant mental impairments that have a significant impact on both his ability to have planned and executed this crime, so it feeds into a residual doubt aspect. Regardless of why, it feeds into the residual doubt aspect. And he has mental impairments that are such that whether his ability to resist impulses, et cetera, is highly questionable. Now, under that circumstance, you know, I want the jury to see the whole picture. That whole picture is he's had significant head trauma, some of which he had nothing to do with. He didn't shoot himself in the back of the head. He didn't hit himself in the back of the head with a lug wrench. Those things are significant head trauma, traumatic brain injury that he suffered. Did he abuse alcohol as well? Yes. I still think the jury seeing the entire picture is what is necessary here. Now, if I had been on the defense side and I could have gotten the head trauma in and not brought the alcohol abuse in, I might have tried, but if I had a choice, I'd get it all in rather than none of it. No question about that. Can I get your help in evaluating Justice Sunstein's opinion? You've mentioned the deference, so we have to show it. When she makes findings, I guess they're findings, that it's unlikely the trial court would have been informed if this examination had taken place. I mean, how do you apply the AEDPA analysis to that? That's the first aspect of the court's two-pronged issue on deference. The first is, well, you never would have had this evaluation done.  Frankly, that's made up out of whole cloth. This man had a gunshot wound to his head that is apparent in the medical records. Even the Georgia Supreme Court agrees there would be a preliminary psychological evaluation. That would pick up, A, borderline IQ, which the Georgia Supreme Court acknowledges will be registered there, and, B, if there's any discussion with Mr. Lance, picks up that he's had a gunshot wound to his head. That is a direct red flag that says you do further testing and evaluation, which is what was done here. And when the further testing and evaluation is done, it leads to this conclusion. So, I mean, I don't think there's any way that statement, that a Georgia court would not have authorized funds to do neurological testing of the sort that was done when somebody did anything in this case. There's just no support for that in the record. What there is in the record is Dr. Martell, the state's witness, saying he does this sort of neuropsychological evaluation all of the time, all over the country. There's testimony in the record from Dr. Weinstein that he does this type of evaluation in every death penalty case that he's involved in, that it's standard to do it there. And in this case, whether it would be absolutely standard in every case, we've got red flags that jump off the page and say you need to do this. I don't believe that consistent with the Supreme Court's decision in Ake and the more recent decision in McWilliams, I mean, if the court were to say, no, we're not going to authorize that sort of psychological testing, that's in itself a separate and independent violation of constitutional rights. I don't think there's any way that can be a reasonable application of controlling federal law. But that's an assumption in her opinion, really. It's, again, there's nothing in the record that is tied to. The court doesn't purport to cite anything. It's just a statement that they doubt that this sort of testing would have been authorized. And I say I don't think there's any way that doubt can be reconciled with controlling federal law. So when you go through that, I think that first prong, that you wouldn't do the evaluation, ignores the red flags that are on PILA and other cases say you have to pay attention to. And then when you get to the second prong, which is, okay, had the testing been done, it wouldn't have mattered. Interestingly, the court doesn't deal at all with the fact that in Georgia a death penalty decision has to be unanimous. And, you know, the standard of reasonable probability of a different outcome is could one, would one juror hearing all of this, is there a reasonable probability that one juror says, you know, I don't think we should execute someone who has dementia and had it at the time of the crime. I think it's mere fact that it's hard to even say those words is an explanation of why the Georgia Supreme Court never mentions the word dementia and why Judge Hunt, who then tracks the Georgia Supreme Court decision, doesn't really discuss that either and why, frankly, the state in its briefing really doesn't discuss that fact either. There's pretty substantial evidence to contradict it, though. I mean, you can consider it. I mean, look, he went over to their house, right, and systematically murdered them, right, as the Georgia Supreme Court said. He, in a manner that he had threatened to do to one of the victims previously, there is a lot about this that would have been considered an aggravation in the mix that would have contradicted the theory that he couldn't have preplanned the event. The jury would have heard all of that. And the jury, having heard all of that, has then a basis of residual doubt. And one question is, frankly, Your Honor, when they would have heard it. And my time is up. If I finish this up. Yes, certainly. Had this been done, had the penalty phase work been done, the guilt-innocence phase of this trial would have been materially different because this evidence goes to both. You have saved 10 minutes for rebuttal. Thank you. Ms. Burton. May it please the Court. I'm Beth Burton here on behalf of the respondent appellee asking this Court to affirm the denial of federal habeas relief. In the Georgia Supreme Court, in their analysis of the mental health issue with regard to the effectiveness of counsel, it is not an unreasonable application of law. It is not based on an unreasonable determination of fact. It is based on almost an exact, the same exact analysis conducted in Elledge v. Duggar. I mean, there's no disagreement by the experts in this case that Mr. Lance's IQ is either 78 or 79. Correct. And Justice Hunstein, in her opinion, refers to that as the lower range of, quote, normal intelligence. I mean, that's not right, is it? Well, normal intelligence, 80, and 80 would be lower range of normal intelligence. A shorter answer might be yes, that's not right. Yes, that's not right by one point. But I don't want to get it confused with borderline intelligence or IQ of 78 or 79 and borderline intellectual disability because those are two separate things. We have no functioning prong here. I mean, as the Georgia Supreme Court noted in their opinion, upon all the review of the evidence, the only time he functions, doesn't function normally in society is when he's committing criminal behavior. This is a man who owned his own company, quite an entrepreneur actually, supported his children. But I do find it odd. The opinion says, quote, some memory problems. I mean, experts on both sides were saying he had dementia. I mean, it's an odd. Well, I think when you look at the Georgia Supreme Court, what the Georgia Supreme Court did, it laid out each of the experts' factual findings. When it did, it's what was conceivably available. That's sort of the second alternative finding. And when it laid it all out, what they said was he would have, their experts said, he would have, may have problems planning it. Nobody ever said he couldn't plan this crime. Nobody ever said he was unable to carry out this crime. What Dr. Martell said was that he had dementia and he had memory problems in that his main significant problem was being able to remember names of stuff. Dysnomia, a form of aphasia, being able to recall a certain name. If he went to the grocery store without a list, he may not remember everything he was supposed to get. Dr. Martell is the one that really discusses memory. The rest of them talk about frontal lobe disorder and planning and impulse control. But even their findings there, as noted by the district court, are very equivocal. Like I said, they don't say he couldn't do it. They said it's unlikely that he couldn't do it. And the Georgia Supreme Court listed all that out and took that into consideration in conducting its prejudice analysis. I'm going to ask you the same question I asked Mr. Lowland. Do you think that when the Georgia Supreme Court reweighed the mitigation evidence, they included the good character evidence? They did not, but that was not raised on appeal. Okay. In this case, because relief was granted as to the mental health claims, respondent appealed a direct appeal from the denial to the grant to the Georgia Supreme Court. It existed, but it wasn't thrown in the hopper. Right. And petitioner cross-appealed, but only on the issue of non-mental health experts. He did not raise the claim of character. Can I ask you, do you agree that there was deficient performance in this case? We have never conceded. And still to this day? I will not say it's my strongest argument about that. But I don't concede it. It's been a while since you really had to worry about it, though, right? That's true. That's true, because that's not going to carry the day here, and I'm well aware of that. And I say that, and it's kind of looking at what the Georgia Supreme Court did in their initial analysis, which I was saying follows Elledge, is that you don't look at what you could have come up with. You have to look at, under Strickland, and that's what Elledge does, it's a fact-specific application of Strickland, and this is a lot of reasonables, but what would a reasonable attorney have done conducting a reasonable investigation? What would he in reasonable likelihood have obtained and or presented? And that's what the Georgia Supreme Court did. It conducted that analysis saying, what would a reasonable attorney conducting a reasonable? You know, I don't read it that way. I think they're analyzing what a reasonable trial judge would have done as opposed to what the lawyer would. Well, and I think they do both. I think the court says, you know, if the trial counsel had known, and it's not clear in the record what trial counsel did know and what he didn't know, but if he had known that Petitioner had wrecks, sometimes when he was drinking and driving, sometimes when he was eluding police officers, if they had known that one time he had ingested fumes, if they, I think the one time he siphoned gas and swallowed it as a child, the alcohol abuse that he was shot in the head, then that he had gone to Georgia Regional. And actually checked himself into Georgia Regional more or less to try to avoid prison. But they said if you knew all that, it's doubtful that reasonable trial counsel would have obtained a psychological evaluation because the records from Georgia Regional don't show any impairment. They show he was. So the records from Georgia Regional were from 1993 or something like that? 1993. 1993, yes. And that was when he checked himself in because he was depressed, right? Or whatever reason. But, I mean, that was not a mitigation investigation, an evaluation for a mitigation investigation. No, no, it wasn't. And it would have to be different, wouldn't it? Well, he was there for eight days. The George Brown court said he's there for eight days, and they did a psychological assessment of him, and it turns up nothing except he has an adjustment disorder based on his divorce from his wife. But you agree that that is not the type of evaluation that would be done even for a compensated stand trial, right? I mean, it's different. I would assume they would definitely be different. But you've still got absolutely nothing showing up in this. And the George Brown court said there's nothing after eight days showing up. There's also you have to prioritize your funds. And what Mr. Brannon did say, and, again, I'm not arguing deficiency, but what he did say was I had to prioritize my funds, and mental health was low on the list. That's not something I thought that I needed. But he also, I mean, he wasn't doing any mitigation investigations. That wasn't even on the list. Well, and what the George Supreme Court said was, And this is directly in line with all the cases in the precedent of this court where a petitioner or a defendant gets a competency evaluation, and trial counsel is talking with that defendant and has no indication of any mental health problems. And time after time after time, this court has said reasonable counsel doesn't have to follow through with a mental health evaluation if there's nothing they're saying. But you've already agreed that what he got in 1993 was not the same as would be conducted for a... I don't think it is a competency evaluation, but I think taking those two together, taking that there is nothing in the record showing any mental health problems, nothing, even after this evaluation, that you've got to prioritize your funds, and that Dr. Martel said... I mean, some would say that all of the abuse and that type of thing would suggest that there's some kind of a mental health issue there. I mean, I tend to agree with you that on the prejudice prong, there may be a problem for the petitioner because I don't know that he can show that it's an unreasonable application. But on deficient performance, I mean, I think counsel at least had the obligation to investigate this a little bit. I mean, there's nothing. I'm not arguing deficient performance. I'm just talking about the Georgia Supreme Court's finding of reasonable counsel may not have gone further, and if you don't go further, you're not going to find this same type of evidence. That was sort of their completion of what I call the first of their analysis. I guess I don't find that to be reasonable, but it may not matter ultimately. And Dr. Martel, which the Georgia Supreme Court also credits or notes his testimony where he says, you know, the deficiencies that petitioner has are so mild that a layperson wouldn't necessarily notice them, and even a mental status exam like you would usually do in these cases or any case may not pick it up at all or indicate that you need further. He said in casual conversation, you wouldn't pick it up. But he also says like a mental status exam, you're not sure that would be adequate to trigger a full neurological. And so the Georgia Supreme Court also noted that saying, taking all that into account, you may never have gotten there. But then they went further. Even if you didn't. Even if you know, even if you go through and you know everything that they had at state habeas, if you have all the same evidence, all the same experts, and the court basically set it out, what each one had found, that he has impairments in planning, that he would have trouble planning this crime, and then that Martel said he wouldn't have trouble planning, that his symptoms were so subtle that nobody would notice them, and they weren't significant to the crime at all. And the Georgia Supreme Court basically said, okay, we're going to show, we're going to put everything in your favor, and here's what we have. You function in the lower range of normal. Let's say one point below lower range of normal. You have some memory problems. I mean, that's intellectual disability. No, it is not intellectual disability. Below 80. You have to have three more things for intellectual disability. He's got IQ. But it's not normal. Come on. It's one below low average. I'm comfortable with that, and that's what Dr. Martel testified to. But again, as the Georgia Supreme Court said, he has no problems functioning in society except for his criminal behavior. But given that, given the memory problems, depression related to his divorce, his impulsivity, that he's more impaired when he's drunk, and noting, and the Georgia Supreme Court even said, this is somewhat, this may be somewhat mitigating evidence, but when you weigh it against the horrific abuse against Joy, the fact that he had done this before to Dwight Wood, the other victim, the way this crime happened and the demeanor after, there is no prejudice. And the long history of abuse. And what he tells others after. Excuse me? What he tells others after. Exactly. Exactly. And with the long history of abuse, it starts in 1989 with Jill Love where he beats her beyond recognition, her sister, Joy's sister. And then it is documented. This is a case not where people or where Joy's just coming in to testify. This is documented in friends. It is documented with family. It is documented with police reports. It is documented in an audio, video tape that was presented at trial of Joy telling what had happened. So she was essentially a witness at her own trial. Just for reference, there was three days of similar transaction hearings. That is, it took up 600 pages. The trial in this case, excluding Dwight Deere, took up 1,200, 600 pages. Eighteen witnesses that could have been called were not called. Additional incidents were not put in. I think we left out ten out of our brief that went in at trial. So we are talking horrific abuse. And we know that he can plan. Although his expert says he might have had trouble planning, we know he can because he's done it before. He did the same exact thing before except he went to Joe Moore's house. I mean he went to Butchwood's house with somebody. And the children in that house recognized his accomplice so they had to leave. But this time he called Joy's father. Is Joy there? No. Are my children there? Yes. So now we know we're not going to get called. He goes and gets his shotgun. Later tells someone that that was a mistake. And that was a mistake. He gets his shotgun shells. He drives five miles over there. He shoots Butchwood. And he doesn't perseverate, as Dr. Martell says. He uses the gun two different ways. He switches around and he beats Joy. Kills her by beating her face in. I think you probably have a unanimous panel on this is a horrible crime. Yeah, I mean he can plan. And then he goes back and he gets rid of the evidence. And so the fact that his experts are saying that all these significant impairments and this dementia is he can't plan, that's completely undermined by this evidence. His demeanor afterwards that he said. Can I just take you back to Justice Hunstein's opinion? I know you are a lot more of an expert in this field than I am, but it strikes me as so odd. I mean this whole thing about it's highly likely that the trial court would have ordered this kind of test as opposed to that kind of test and the one that I read you before. It's unlikely that the trial court would have been informed, you know, through a general, through the type of test that we've now hypothesized that it would have ordered. And then it's unlikely the trial court would have exercised its discretion to do this or that. How do you analyze that? I mean is that, are those findings a fact? Are those, I mean how do those fit into the Supreme Court, you know, established law in these cases? I think it's a combination of findings of fact and applying those facts to, I'm just saying that they don't cite ellage but it's the same analysis as ellage or the Strickland analysis. I just think it's applying those facts to the Strickland analysis. And much of Strickland, I mean everything we do really with regard to prejudice you have to speculate is it a reasonable probability going to affect the outcome or not. But in this case. You don't have to speculate about what, I mean I don't see that. Maybe I'm just not informed but of course speculating about what the trial judge would have done instead of evaluating the performance of counsel or the prejudice from the performance of counsel. And I think the more important part because is based on Strickland, what would a reasonable attorney have done and where would it have led you? And I think that is the analysis that's being conducted. Sometimes the determination may be would that evidence have been admissible, for example. Right. There are some speculations about what trial courts do that we have to engage in after the fact in this area of litigation, right? Correct. And I think when the George Supreme Court is saying it's just a whole host of unlikely, I mean I think that's exactly what they said is because of all the unlikeliness that counsel would seek the evaluation that the trial court would grant the request that the initial mental status exam would lead to a full or the trial court would have ordered a full based on any of this or what they may have determined is lack of showing of prejudice because you would not have found the same evidence. But again, if you're bothered by that, you can go straight to if you had it all, it still is no showing of prejudice. Isn't that the easiest way to resolve this issue? I believe it is. I mean, anything else would require considerably more work, wouldn't it? It would. I mean, obviously, just like you can skip deficiency and go to prejudice, I think you can go to their alternative finding. And the last thing I will bring up is that his experts say he's impulsive and he has problem issues with impulse. And I think we've cited in our brief Wong v. Valmontes where it's just what you say afterwards certainly can be taken into consideration and undermine findings of impulse. And in this case, as we said, all the statements he made about joy, all the statements he made about Butch Wood, including her eyeball, he hit her so hard her eyeball stuck to the wall. Those, the Georgia Supreme Court said, given a long history of contemplating her murder, I mean threatening trying to hire somebody to do it, the manner in which it was done and the utter disregard for suffering and the deaths, there's absolutely no prejudice. This is a cold and calculating murder that had been planned for years. And he finally did it. The findings of the Georgia Supreme Court are not objectively unreasonable, and we would ask this court to affirm if there are no more questions. Questions? I don't. Thank you, Ms. Burton. Mr. Loveland, you've saved 10 minutes for rebuttal. Thank you, Your Honor. Recognizing that I think the court and even Ms. Burton underscore that deficient performance is not the strong point of the state's case, the fact is the Georgia Supreme Court expressly found there was deficient performance here. The court said, the habeas court concluded the counsels performed efficiently in failing to prepare for Lance's trial by investigating Lance's background. We agree. We hold trial counsel performed well below basic professional standards by choosing not to discuss issues other than guilt or innocence with his family. There was clearly deficient performance. So the question is, was there prejudice? It's actually more than that, right? Because I think you could find there was prejudice. But the question here is whether it was unreasonable for the Georgia Supreme Court to conclude that there wasn't prejudice, which is a slightly different question. No, absolutely, Judge Rosenbaum. You're correct. The standard is, and I believe it's identified, I hope I've identified it correctly, was it objectively unreasonable for the Georgia Supreme Court to conclude that there was no prejudice given that there was nothing done at the sentencing side of the case? And I think it's important to keep that in mind. That can be often the case in this context. I mean, that's not unusual that we get mitigation cases where nothing was done and then we have considerable work done in state collateral review and we defer to a reasonable determination that it would not have made a difference. I mean, there are a lot of cases in this circuit that have that, right? There are. And I've tried to read as many as I could, and I won't say that I've read them all. Because there are a lot. There are a lot. But let's talk about a couple that we do know of, Farrell v. Hall, which this court ruled that the Georgia Supreme Court's determination of no prejudice was an objectively unreasonable determination because investigation that should have been done was not done, and had the investigation been done, it would have revealed evidence of mental impairments and a borderline IQ. It's similar. Now, is there other evidence in Farrell v. Hall? Yes, there is. Are there other factors that are not here? Yes. Are there factors that we have that they didn't have?  There was no finding of dementia by the state's expert in Farrell v. Hall. There is, to my knowledge, no case in which a court has said that a defendant who suffers from dementia, according to the expert testimony of both sides, is not prejudiced when the jury doesn't hear that fact. Now, this, again, put it in the context of objectively unreasonable. There is no argument for why a jury shouldn't hear that fact, and I haven't come up with any argument for how that fact is not significantly mitigating. This court has ruled— Frankly, that's not the issue, whether the jury should hear it. It's whether the jury, had it heard it, would have made a difference. Correct. And not whether— It's reasonable to conclude that it wouldn't have. No, the question is not, I submit, Your Honor, is not would it have made a difference. The assumption is that the jury should have heard it, right? I mean, if the assumption is that there was deficient performance, that means the jury would have heard it, right? Right. Had the jury heard this, then the question is, is there a reasonable probability of a different outcome? Then the question is, is it unreasonable to conclude that there's not? Yes. And within that context, I believe that what the Georgia Supreme Court does not do and doesn't address at all under the legal standard is the fact that in Georgia, only one juror can stand as the obstacle to the death penalty. So the question is not, is this going to change the mind of 12 jurors? The question is, is there a reasonable probability? As the Supreme Court said in Rompila at the end of the day, it is not the burden to show that there would have been a different result. The ultimate burden is to shake the court's confidence in the result that obtained. And in this case, that confidence must, I submit, objectively by any reasonable standard, be shaken when you have two situations, the one that existed where there was no evidence and the one that existed in the post-conviction hearing where there is agreement on dementia. And let's be clear about this. The evidence there was found by the state habeas court, and the Georgia Supreme Court does not in any say, say this is clearly erroneous, was readily available evidence that were red flags signifying it. Now, that's the factual record here. What the Supreme Court does, and I think what makes their decision objectively unreasonable, is they simply ignore the facts and mischaracterize the testimony to get to their conclusion that it wouldn't make a difference. But if you say the words, this defendant has dementia and everyone agrees with that, that is a mitigating factor that you don't blame the defendant for, and it, we believe, raises the level of objectively unreasonable determination in that regard. Now, let me address, let me address quickly a couple of other points that were raised. Ms. Burton referred to the Elledge v. Duggar case. It's actually an interesting case because what it showed was, and what it stands for, is that in fact you don't have to go throughout the country to find the one outlier of an expert who might support you, and if you find him, that's not going to tip the balance. That's what Elledge v. Duggar basically says. There, there was consistent testimony by mental health experts against, that said basically he did not suffer from impairment, and on post-conviction the defense found one expert who would say that he did suffer from impairments, and what the court said is, yeah, you don't have to assume that counsel is going to go find this one person hidden in Massachusetts and bring him down to Georgia to testify. That's not our case. Everyone who looked at this gentleman, every expert who looked at him, the state continues to suggest the impairments are not particularly significant. Please look at Dr. Martel's testimony. He acknowledges that dementia, by its very definition, involves significant impairment of multiple cognitive functions, including the ability to carry on and function in life normally. Now he may say it's, quote, mild dementia, but dementia to get to the threshold has to be significant impairments. Now, what the state says is, but he then said that he was fully capable of planning and executing this crime. He doesn't really say that. What he says is, if I assume he committed the crime, then the fact of the crime is the best evidence of his behavior. But I asked him specifically, Dr. Martel, did the state tell you there was no fingerprint found, there was no DNA evidence, no murder weapon was ever found, no bloody clothes were ever found? No, he knew none of those facts. He was told none of that in deciding whether to offer an opinion about whether he could have planned a crime, disposed of all the materials, and done all of that. He had no information on that and didn't express any opinion on that whatsoever. So I think at the end of the day, we all come back to this question of was there prejudice. And I understand and agree with the court's understanding. It's a tough burden. I've got that. But I think it's also not an insurmountable burden. That's what this court said in the Farrell case. And in this case, we have a situation where, yes, there's a lot of aggravating evidence. There's no question about that. A lot of that relates to impulsive actions of this individual that can be tied to the very mental impairments and defects that he suffers from. And the jury never heard any of that. I don't think there's any question there was deficient performance. I think it's an objectively unreasonable determination or an objectively unreasonable application of the law. And I'll say finally between those two, I've tried to understand the difference between what an unreasonable application of the law is and what an unreasonable determination of the facts within the context of the law is. And I think they come out pretty close to the same. And under either one, this is objectively unreasonable. Any other questions? No, thank you, Mr. Loveland. We will be in recess until tomorrow morning. All rise. Oh, Mr. Loveland, third time today I've done this. I failed to acknowledge that you were court appointed. And his whole team. And your whole team. And we appreciate you accepting the appointment and discharging your duty well and honorably and assisting the court today. And, of course, we appreciate the public service from the Attorney General's office as well. Thank you.